# THE METROPOLITAN DISTRICT *v.*
# TOWN OF BURLINGTON
# (SC 15439)

Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued January 23—officially released June 17, 1997

*Wesley W. Horton*, with whom were *Kimberly A. Knox*, *Charles W. Bauer* and, on the brief, *David A. Robles*, legal intern, for the appellant (defendant).

*Bourke G. Spellacy*, with whom were *Christopher R. Stone* and, on the brief, *Ian J. Platt*, for the appellee (plaintiff).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether, under General Statutes § 12-76 (a),[1] a munici-

---

[1] General Statutes § 12-76 (a) provides: "Land owned or taken by any municipal corporation, including any metropolitan district established under provisions of the general statutes or any special act, for the purpose of creating or furnishing a supply of water for its use shall be exempt from taxation when the inhabitants of the town in which such land is situated have the right to use, and use, such water supply upon the same terms as the inhabitants of such municipal corporation; otherwise such land shall be liable to taxation, shall be assessed in the town in which such land is situated to the corporation owning or controlling such water supply, shall be valued at what would be its fair market value were it improved farm land and shall be assessed at the uniform rate required by subsection (b) of section 12-62a, notwithstanding the provisions of section 12-63 or any special act. Any such municipal corporation shall, with respect to any such land acquired on or after January 1, 1978, which is situated in a town other than that in which such municipal corporation is located, make annual payments to such town equal to the taxes which would otherwise be due if such land were assessed in accordance with section 12-63, exclusive of any taxes on improvements made on such land subsequent to acquisition by such corporation."

General Statutes § 12-62a (b) provides in relevant part: "Each such municipality shall, no later than the close of its next revaluation required under the provisions of section 12-62, assess all property for purposes of the local property tax at a uniform rate of seventy per cent of present true and actual value . . . ."

General Statutes § 12-63 provides: "The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be as if such

pal tax assessor is required to value water supply land for property tax purposes as improved farmland with a continuing farming use, or whether the statute permits water supply land to be valued based upon the highest and best use of the property. The plaintiff, the Metropolitan District, brought an action in the trial court challenging the refusal by the board of tax review (board) to reduce the valuation by the defendant, the town of Burlington, of 2431.7 acres of water supply land owned by the plaintiff. The trial court sustained the plaintiff's challenge to the board's decision and reduced the assessment of the property from $9,806,860 to $5,471,325. The defendant appealed from the judgment to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The following facts are not in dispute. The plaintiff is a specially chartered municipal corporation providing water and sewer service to eight member towns and to customers in twelve additional communities throughout central Connecticut. The defendant valued the plaintiff's water supply land from October 1, 1988, through October 1, 1994, at $5761 per acre for a total assessed value of $9,806,860.[2] Pursuant to General Statutes § 12-117a,[3] the plaintiff filed an application in the

open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. The present true and actual value of all other property shall be deemed by all assessors and boards of assessment appeals to be the fair market value thereof and not its value at a forced or auction sale."

[2] The total assessed amount is equivalent to 70 percent of $13,860,690, which is the present and actual value of the plaintiff's property as determined by the defendant. See General Statutes § 12-62a (b).

[3] General Statutes § 12-117a provides in relevant part: "Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of

Superior Court to appeal from the board's denial of the plaintiff's request for a reduction of the assessment that had been levied against it. The complaint alleged that the board had failed to follow the statutory mandate set forth in § 12-76 (a) in making its assessment, and that the defendant had not notified the plaintiff of the

such action, make application, in the nature of an appeal therefrom . . . to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

tax increase in violation of General Statutes § 12-55 (a).[4] In its answer, the defendant stated that it had not followed the mandate set forth in § 12-76 (a) because it had assessed the plaintiff's water supply land at 70 percent, rather than at 100 percent, of its fair market value for the years prior to an amendment to § 12-76 (a), which was to take effect in 1992, providing that such land was to be assessed at 70 percent of its fair market value.

The case was tried to the court on the following issues: (1) whether the defendant had properly valued the plaintiff's water supply land; (2) whether the plaintiff had received adequate notice of the increase in the assessment within the time period mandated by § 12-55 (a); and (3) in the event that the trial court decided to reduce the assessment, whether the defendant should be allowed to offset the reduction by the amount that the defendant could have collected from the plaintiff if it had taxed the plaintiff's property at 100 percent

---

[4] General Statutes § 12-55 provides in relevant part: "(a) When the lists of any town have been so received or made by the assessor or board of assessors, they shall equalize the same, if necessary, and make any assessment omitted by mistake or required by law. The assessor or board of assessors may increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list, but, in each case of any increase in valuation of such property above the valuation, if any, stated by the person filing such list or in each case of any increase of valuation above the valuation of such property in the last-preceding grand list, except with respect to the valuation of any motor vehicle, they shall send written notice by mail of such increase in accordance with subsection (b) of this section, including in such notice the valuation prior to and after such increase with respect to each parcel of real property or any improvement thereon, the valuation of which has been increased, to the last-known address of the person whose list or valuation is so changed. . . .

"(b) The written notice of assessment increase as required in subsection (a) of this section shall be mailed no earlier than the assessment date and no later than the tenth calendar day immediately following the date on which the grand list abstract is signed and attested to by the assessor or board of assessors. If such assessment increase notice is sent later than the time period herein prescribed, such increase shall become effective on the next succeeding grand list."

of its fair market value for the years 1988 through 1991. At trial, the appraisers for both the plaintiff and the defendant agreed that the plaintiff's water supply land was taxable under § 12-76 (a), and that the property was located in a residential zone, which permitted the following uses: single-family detached dwellings, farming, forestry and forestry reserve, fish and wildlife refuges, and watershed management and similar conservation uses. Each appraiser further claimed to have appraised the plaintiff's water supply land as if the property were "improved farm land" in accordance with § 12-76 (a).

The defendant's appraiser, Arthur Oles, stated in his appraisal of the plaintiff's property that "[a]s defined, the highest and best use of the [plaintiff's] property as improved farmland is for single-family residential development. . . . As improved farmland, the property is ideal for residential development, having been altered or developed from its natural state in order to enhance or promote its use for farming." Based on an analysis of ten sales of residentially zoned land in north central Connecticut, Oles valued the plaintiff's property at $6000 per acre for a total amount of $14,590,200.

The plaintiff's appraiser, Edward F. Heberger, offered two different analyses of the value of the plaintiff's water supply land. Under the first scenario, Heberger valued the plaintiff's property at $2015 per acre, for a total amount of approximately $4,900,000, by comparing sales of property whose highest and best use was as a single-family residential development. Under the second scenario, Heberger analyzed comparable sales of property sold for continuing use as farmland. Because of a lack of comparable sales of improved farmland in the town of Burlington, Heberger compared sales of improved farmland, purchased for the purpose of continuing use as farmland, that was located primarily in flood plains along the Connecticut River. Under

this analysis, he concluded that the value of the plaintiff's property was $1604 per acre for a total amount of approximately $3,900,000.

The trial court sustained the plaintiff's appeal from the board's assessment and determined that the defendant had improperly construed § 12-76 (a) in valuing the plaintiff's water supply land. In its memorandum of decision, the court stated that "[u]nder normal circumstances, the real estate owned by the [plaintiff] would be valued at its fair market value. . . . However, in the present action, the legislature has seen fit to define the highest and best use of the subject property of the [plaintiff] to be 'improved farmland.' " (Citation omitted.) The trial court noted that this court had defined the term " 'improved farmland' " in *Metropolitan District* v. *Barkhamsted*, 199 Conn. 294, 302, 507 A.2d 92 (1986), as "land that has been altered or developed from its natural state in order to enhance or promote its use for farming." In light of this definition of improved farmland, the trial court determined that Oles, and Heberger in his first scenario, had misconstrued § 12-76 (a) by "using comparables related to the development of residential property."

In other words, the trial court determined that § 12-76 (a) provided a departure from the general rule that property should be valued based on the property's actual highest and best use by creating a statutory ceiling limiting the highest and best use of water supply land to improved farmland with a continuing farming use. On the basis of this determination, the court concluded that the proper assessment of the plaintiff's water supply land should have focused on an analysis of sales of other farmland properties. Using the higher priced comparable sales set forth in Heberger's appraisal, the court assessed the plaintiff's property, based on its highest and best use as improved farmland with a continuing farming use, at $2250 per acre for

a total amount of $5,471,325. In accordance with this assessment, the court ordered a reduction in the assessment of the plaintiff's land from $9,806,860 to $5,471,325.

The trial court also rejected the plaintiff's claim that it had not received adequate notice of the increase in the assessment pursuant to § 12-55 (a). In addition, finding that "there [was] no evidence that the [defendant] ever took appropriate steps to change the assessment to tax the [plaintiff] at the 100 percent rate," the court dismissed the defendant's claim that it should receive as a setoff those amounts that it had not collected from the plaintiff by assessing the plaintiff's property at 70 percent, rather than at 100 percent, of the property's value before the amendment to § 12-76 (a), which was to take effect in 1992.

On appeal, the defendant argues that the trial court improperly: (1) construed § 12-76 (a) when it assessed the plaintiff's water supply land as if it were improved farmland with a continuing farming use; (2) used comparable sales of flood plain lands to determine the value of the plaintiff's property for assessment purposes; and (3) refused to allow the defendant to increase its prior assessments of the plaintiff's water supply land for the years 1988 through 1991. We are unpersuaded by these claims and, accordingly, we affirm the judgment of the trial court.

I

The defendant first argues that the trial court improperly reduced the amount of the assessment of the plaintiff's water supply land. Specifically, the defendant contends that the court improperly construed § 12-76 (a) by valuing the plaintiff's water supply land based on its fair market value as improved farmland with a continuing farming use, rather than based on its fair market value of what would be the property's highest

and best use as a single-family residential development. We disagree.

Our resolution of the defendant's claim requires an analysis of § 12-76 (a), in which "we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, 'we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.' " *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 431, 692 A.2d 742 (1997). The defendant argues that § 12-76 (a) does not depart from the accepted determination of the fair market value of property based on its actual highest and best use. It is true that, under the general rule of property valuation, " 'fair [market] value, of necessity, regardless of the method of valuation, takes into account the highest and best value of the land.' " *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 34, 633 A.2d 1368 (1993). " 'The "highest and best use" concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate.' " Id. On the basis our review of the plain language and legislative history of § 12-76 (a), however, we conclude that the legislature intended to depart from the general rule of property valuation when it enacted § 12-76 (a).

In looking to the plain language of § 12-76 (a), we are persuaded that the phrase "valued at what would be its fair market value were it improved farm land," means that water supply land should be assessed as though it were improved farmland with a continuing

farming use. In subsection (a) of § 12-76, the word "were" denotes the past subjunctive of the verb "to be." A verb used in the subjunctive mood "represents an attitude toward or concern with a denoted act or state *not as fact but as something entertained in thought as contingent or possible* . . . ." (Emphasis added.) Webster's Third New International Dictionary (1966). In other words, § 12-76 (a) mandates that water supply land should be valued at its fair market value *as if or as though* it were improved farmland with a continuing farming use. " '[W]e presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions.' " *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 347, 680 A.2d 1261 (1996). Construing § 12-76 (a) to mean that water supply land should be valued as if the land were to be developed for single-family residences would render meaningless the phrase "were it improved farm land" in the context of the statute. Had the legislature intended such a construction, the statute would have provided that water supply land is to be valued based on its fair market value.

The genealogy of § 12-76 (a), which this court set forth in *Metropolitan District* v. *Barkhamsted,* supra, 199 Conn. 298, supports this conclusion. The circumstances surrounding the enactment of the statute and its subsequent legislative history reveal that the legislature intended water supply land to be valued based on its use for agriculture. "In *West Hartford* v. *Board of Water Commissioners*, 44 Conn. 360 (1877), we held that a reservoir owned by a municipal corporation in another town was *not* subject to taxation in the town where the reservoir is situated. The General Assembly's dissatisfaction with the result of this case prompted adoption of the original version of § 12-76, which provided: 'Land owned or taken by any municipal corporation, for the

purpose of creating or furnishing a supply of water for its use or benefit, shall be liable to taxation, and shall be set in the list in the town where such land is situated, to the corporation owning or controlling such water supply, *at a valuation which would be fair for said land if used for agricultural purposes*: provided, however, that no such land shall be liable to taxation, or set in any list as aforesaid, wherever the inhabitants of the town in which the said land is situated have the right to the use of such water supply upon the same terms and conditions as the inhabitants of such municipal corporation, and when such town actually uses the same.' . . . Public Acts 1879, c. 79." (Emphasis in original.) *Metropolitan District* v. *Barkhamsted*, supra, 298–99. In other words, requiring a town to value water supply land as property whose highest and best use was for agricultural purposes was the means by which the legislature aimed to provide fair compensation to a taxing town without imposing an undue tax burden on customers of municipal corporations.

Subsequent amendments to § 12-76 (a) did not alter the legislature's original intent in enacting the statute. "[I]n 1913, the legislature deleted the language 'at a valuation which would be fair for said land if used for agricultural purposes' and substituted '*at the average assessed valuation per acre of the improved farming land in said town.*' . . . Public Acts 1913, c. 156." (Emphasis in original.) *Metropolitan District* v. *Barkhamsted*, supra, 199 Conn. 299. This amendment reflected the fact that, in 1913, Connecticut towns were predominantly rural and, accordingly, only restricted the method of valuing water supply land to the comparison of improved farmland located in the same town. In 1963, § 12-76 (a) was again amended to provide that "such land shall be liable to taxation and shall be assessed in the town in which such land is situated to the corporation owning or controlling such water sup-

ply *at what would be its fair market value were it improved farm land.*" (Emphasis added.) Public Acts 1963, No. 490, § 10. Nothing in the legislative record indicates that, in using the phrase "fair market value," the legislature intended to alter the original purpose of the statute that watershed property should be valued according to its highest and best use as improved farmland with a continuing farming use. Rather, No. 490 of the 1963 Public Acts, entitled "An Act Concerning the Taxation and Preservation of Farm, Forest, and Open Space Land," was enacted by the legislature for the express purpose of promoting the conservation of farmland and other open spaces. See 10 S. Proc., Pt. 7, 1963 Sess., pp. 2335–52; Conn. Joint Standing Committee Hearings, State Development and Agriculture, 1963 Sess., pp. 30–50. This amendment to § 12-76 (a) changed the standard of valuation from a comparison of improved farmland solely within the town in which the reservoir was located, to one that also permitted comparison with farmland located outside of the town.

In 1982, the legislature again amended § 12-76 (a) to include land owned by municipal water districts created by special act and added the phrase "notwithstanding the provisions of [General Statutes] section 12-63 . . . ." Public Acts 1982, No. 82-452, § 1. The legislative record does not support the view that, in including water districts under the taxation scheme of the statute, the legislature intended to stray from treating water supply land as improved farmland with a continuing farming use. Rather, the defendant concedes that the legislature's apparent purpose in adding the phrase "notwithstanding the requirements of § 12-63," was to preclude municipal corporations and water districts from benefiting from the lower assessment of water supply land that would result if the statute allowed water supply land to be valued based on averaging the values of *all* types of farmland, including the reduced

values of lands referred to in General Statutes §§ 12-107c, 12-107d and 12-107e,[5] which are assessed under § 12-63 according to their current use. See 25 S. Proc., Pt. 13, 1982 Sess., pp. 4220–22.

The legislative history of § 12-76 (a) thus indicates that the legislature, in setting forth the method of valuing water supply land, intended to depart from the general rule of valuation provided for in § 12-63. The

[5] General Statutes § 12-107c provides in relevant part: "Classification of land as farm land. (a) An owner of land may apply for its classification as farm land on any assessment list of a municipality by filing a written application for such classification with the assessor of such municipality not earlier than thirty days before nor later than thirty days after the date of such assessment list, provided in a year in which a revaluation of all real property in accordance with section 12-62 becomes effective such application may be filed not later than ninety days after the assessment date in such year. Such assessor shall determine whether such land is farm land and, if he determines that it is farm land, he shall classify and include it as such on such assessment list. In determining whether such land is farm land, such assessor shall take into account, among other things, the acreage of such land, the portion thereof in actual use for farming or agricultural operations, the productivity of such land, the gross income derived therefrom, the nature and value of the equipment used in connection therewith, and the extent to which the tracts comprising such land are contiguous. . . ."

General Statutes § 12-107d provides in relevant part: "Classification of land as forest land. (a) An owner of land may file a written application with the State Forester for its designation by the State Forester as forest land. When such application has been made, the State Forester shall examine such application and, if he determines that it is forest land, he shall issue a triplicate certificate designating it as such, and file one copy of such certificate in his office, furnish one to the owner of the land and file one in the office of the assessor of the municipality in which the land is located. . . ."

General Statutes § 12-107e provides in relevant part: "Classification of land as open space land. (a) The planning commission of any municipality in preparing a plan of development for such municipality may designate upon such plan areas which it recommends for preservation as areas of open space land, provided such designation is approved by a majority vote of the legislative body of such municipality. Land included in any area so designated upon such plan as finally adopted may be classified as open space land for purposes of property taxation if there has been no change in the use of such area which has adversely affected its essential character as an area of open space land between the date of the adoption of such plan and the date of such classification. . . ."

genealogy of the statute supports our conclusion that, by enacting and subsequently amending § 12-76 (a), the legislature struck an equitable balance between, on the one hand, the interests of the taxing municipality and, on the other hand, the tax paying customers of water districts and municipal corporations. This balance was achieved by requiring the value of water supply land to be based on its fair market value as improved farmland with a continuing farming use. On the basis of our review of the plain language and the legislative history of § 12-76 (a), and in light of the legislative policy underlying the legislature's enactment of the statute, we conclude that the trial court properly construed § 12-76 (a) to require water supply land to be valued as if it were improved farmland with a continuing farming use.

## II

The defendant next claims that the trial court improperly based the valuation of the plaintiff's water supply land on the value of properties along the Connecticut River flood plains. We disagree.

The following additional facts are necessary to the resolution of this claim. Heberger presented in his second scenario an analysis of nine comparable sales of improved farmland located primarily on flood plains along the Connecticut River that were purchased for continuing farming purposes. In contrast, Oles based his appraisal and testimony solely on an analysis of property sold for the purpose of single-family residential development. Oles did not present any evidence regarding the value of flood plain land or any farmland in the town of Burlington.

In its memorandum of decision, the trial court noted that, in *Metropolitan District* v. *Barkhamsted*, supra, 199 Conn. 302, this court had defined the term " 'improved farmland' " under § 12-76 (a) as "land that has been altered or developed from its natural state

in order to enhance or promote its use for farming."
Agreeing with Heberger that the only available compa-
rable properties purchased for farming purposes were
located in flood plains outside the town of Burlington,
the trial court used the higher priced comparables of
the nine flood plain properties that Heberger had pre-
sented in his appraisal report. Averaging these higher
priced comparables, the court valued the plaintiff's
property at $2250 per acre for a total amount of
$5,471,325.

We afford wide discretion to the trial court's determi-
nation of the value of property in a property tax appeal.
*Carol Management Corp. v. Board of Tax Review,*
supra, 228 Conn. 40–41. Because the trial court acts as
the fact finder, it may accept or reject evidence regard-
ing valuation as it deems appropriate. *First Bethel Asso-
ciates v. Bethel,* 231 Conn. 731, 741, 651 A.2d 1279
(1995); *Carol Management Corp. v. Board of Tax
Review,* supra, 36. "Whether a property has been over-
valued for tax assessment purposes is a question of fact
for the trier." *Newbury Commons Ltd. Partnership v.
Stamford,* 226 Conn. 92, 103, 626 A.2d 1292 (1993). The
trial court's factual findings regarding valuation may be
reversed or modified only if they are clearly erroneous
in view of the evidence and record as a whole. *First
Bethel Associates v. Bethel,* supra, 744. Furthermore,
"the application of [the improved farmland] standard
to a particular parcel of land is a question of fact for
the trial court." *Metropolitan District v. Barkhamsted,*
supra, 199 Conn. 303.

Our careful review of the record reveals that the trial
court properly exercised its discretion as the fact finder
in relying on the higher priced flood plain comparables
provided by Heberger in his appraisal report and in his
testimony. The trial court heard testimony that these
properties all were improved farmland within the mean-
ing of § 12-76 (a) and the definition of that term as set

forth in *Metropolitan District* v. *Barkhamsted,* supra, 199 Conn. 302. Heberger's appraisal of the nine properties detailed the essential characteristics of the properties, including the various ways in which the land had been developed for farming purposes. Noting that the comparables that Heberger had offered restricted the land to basic farming, including cultivation of garden vegetables, corn and hay, and pasture use, the trial court emphasized that *Metropolitan District* v. *Barkhamsted,* supra, 301, had established that improved farmland also included farmland used for dairying and forestry. The trial court based its valuation of the plaintiff's water supply land on the higher priced flood plain comparables presented under Heberger's second scenario. In light of the fact that the defendant did not provide any evidence to dispute the comparable values provided by Heberger, we conclude that the trial court acted fully within its discretion in determining the value of the plaintiff's property based on the higher priced flood plain lands.

III

Finally, the defendant contends that the trial court improperly refused to order an assessment of the plaintiff's property at 100 percent, rather than at 70 percent, of its fair market value as improved farmland for the years 1988 through 1991. We disagree.

Prior to October 1, 1992, § 12-76 (a) provided that water supply land "shall be assessed . . . at what would be its fair market value were it improved farm land . . . ." General Statutes (Rev. to 1989) § 12-76 (a). In 1990, the legislature amended the statute, effective as of October 1, 1992, to provide that water supply land was to be assessed at 70 percent of the property's market value, or "the uniform rate required by subsection (b) of section 12-62a . . . ." Public Acts 1990, No. 90-289, § 1.

In its answer to the plaintiff's amended complaint, the defendant stated that it had improperly assessed the subject property at only 70 percent, rather than at

100 percent, of the property's fair market value before the legislature amended the statute effective in 1992. At trial, the defendant argued that the trial court accordingly should permit the defendant to offset any reduction by the amount of tax that the defendant could have collected during the years prior to the 1992 amendment if it had valued the property at 100 percent of the property's fair market value from 1988 through 1991. The trial court dismissed the defendant's claim on the ground that the defendant presented "no evidence that [it] ever took appropriate steps to change the assessment to tax the [plaintiff] at the 100 percent rate."

It is well settled in Connecticut that tax assessments may only be made in strict conformity with the taxation statutes. *Caulfield* v. *Noble*, 178 Conn. 81, 88–89, 420 A.2d 1160 (1979). Once municipal tax assessors have completed their duties, they have no power to alter a grand list except to remedy a clerical omission or mistake. *National CSS, Inc.* v. *Stamford*, 195 Conn. 587, 594, 489 A.2d 1034 (1985). The defendant does not dispute that its assessors failed to take any steps to increase the assessment of the plaintiff's property for the years prior to the amendment to § 12-76 (a) that was effective in 1992. The defendant's only claim is that the trial court abused its discretion by refusing to exercise its discretionary powers under § 12-117a to "grant such relief as to justice and equity appertains . . . ." In light of the lack of any evidence indicating that the defendant had attempted to follow the statutory provisions regarding the correction or modification of assessments of real property, we conclude that the trial court acted well within its discretion in refusing to allow the defendant to increase the assessment on the plaintiff's property for the years 1988 through 1991.

The judgment is affirmed.

In this opinion the other justices concurred.