[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The key issue in this municipal real estate tax appeal is what was the highest and best use of 46.79 acres of land owned by the plaintiff located on the easterly side of Filley Street in the town of Bloomfield on October 1, 1990, the date of the last town-wide revaluation. The assessor placed a fair market value on the land of $1,071,430 as of October 1, 1990.
We find the following facts. The plaintiff, Satpal Rathie, purchased the subject property on December 7, 1995 from the Resolution Trust Corp. for $73,000. The owner of the premises on the date of the last town-wide revaluation on October 1, 1990, was Lane Homes, Inc. Lane Homes purchased the subject land from Dana Eric Friedman, Trustee, on April 29, 1988, for $2,964,000. Prior to Lane Homes' acquisition of the land, the Bloomfield Planning and Zoning Commission had approved a zone change for the CT Page 5460 subject property from moderate density residential zone (R20) to Planned Luxury Residential Development zone (PLR). On July 9, 1987, the planning and zoning commission approved a site plan for the construction of 116 luxury residential units known as "Glenwood Green" on the subject property. (See defendant's exhibit 2.)
Prior to the introduction of the PLR zone into the Bloomfield zoning regulations, Bloomfield had a "garden apartment" zoning regulation under which most garden apartments were constructed in the 1960's and 1970's. The garden apartment zone was repealed and no additional apartments were constructed for a number of years in Bloomfield. Sometime prior to October 1, 1986, the zoning commission determined that the town was ready for new apartments and approved the PLR zone regulation containing basically the same provisions as the repealed garden apartment regulation.
The subject property is a unique parcel of land located in a residential area of Bloomfield between Filley Street and land owned by the State of Connecticut known as Blue Hills Reservoir No. 2. This reservoir defines the easterly boundary of the subject by an earthen retention damn. The immediate area of the subject is sparsely developed farmland and residential homes. The west side of Filley Street is dominated by the Wintonbury Reservoir. Both the Blue Hills and Wintonbury Reservoirs are dry reservoirs. The Federal Emergency Management Agency (FEMA) map revised to September 30, 1988 (defendant's exhibit 1) shows most of the subject land to be outside of the area determined to be the 500 year flood plain. All of the land within the Blue Hills and Wintonbury reservoirs are within the 100 year flood plain. Very small portions of the southeast and easterly side of the subject are within the flood plain areas. Less than 1.78 acres, or 4%, of the subject land is in the flood zone. The FEMA map was in effect on October 1, 1990. About 25% of the subject land is encumbered with wetland areas. The wetlands are delineated on a site plan map dated June 16, 1987, showing the layout of the 116 units at Glenwood Green. (Defendant's exhibit 2.) This map shows the stamped approval by the planning and zoning commission on July 9, 1987. The site plan shows two power line easements and a sanitary sewer easement along the southeasterly border of the property. These easements take up about 1.06 acres, or about 2%, of the 46.79 acres of land. None of these easements, nor the wetlands, interfere with the approved development of the land. Public sewers, public water, and electricity are available to the site. A gas line is about 400-500 feet away from the site and is CT Page 5461 available for use at the site. The Bloomfield town planner, Thomas Hooper, concluded that the Glenwood Green development was a "text-book development" under the PLR zone regulations. The 100 foot buffer zone along the designated wetlands and the 200 foot buffer zone along the watercourses, which went into effect in 1988, do not impact unfavorably on the development. Although the 1987 zoning approval of the site plan expired in June of 1989, the planning and zoning commission granted a one year extension to July 1990. In June of 1990, the planning and zoning commission again extended approval of the site plan for an additional two years. The subject property, on October 1, 1990, the date of the revaluation, had the approval of the planning and zoning commission to develop Glenwood Green subject to three conditions, which were attached to the 1990 approval extension: 1. The owner must post a performance bond; 2. the owner must obtain a wetlands permit for the development; and 3. correct the grading contours on the site plan. None of the three conditions were beyond the ability of a developer to fulfill. The Bloomfield inland wetlands watercourses commission had previously approved the Glenwood Green site plan. Although the inland wetlands 
watercourses commission's approval of the site plan had expired prior to October 1, 1990, the commission would have granted a renewal of its approval if substantial work were completed on the site. (See plaintiff's exhibit C.)
The plaintiff's appraiser, Norman R. Benedict, was of the opinion that the highest and best use of the subject land on October 1, 1990, was not for development under the approved site plan, but rather "to do nothing with the appraised land until that point in time in the future when sufficient demand `might' occur to develop the appraised site." (Plaintiff's exhibit B, p. 29.) Benedict concluded that the fair market value of the subject land as of October 1, 1990, was $115,000.
The town's appraiser, Peter R. Marsele, was of the opinion that the highest and best use of the subject property as of October 1, 1990 was as a development of 116 residential units.
 The highest and best use concept, chiefly employed as a starting point in estimating the value of real estate by appraisers, has to do with the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate.
CT Page 5462
(Internal quotations omitted.) The Metropolitan District v. Townof Burlington, 241 Conn. 382, 390, 692 A.2d 969 (1997), citing Carol Management Corp. v. Board of Tax Review, 228 Conn. 23, 34,633 A.2d 1368 (1993).
With this definition in mind, we look to the use of the subject land on October 1, 1990, which would produce the highest market value in an arm's length transaction between a willing buyer and a willing seller.
On October 1, 1990, the subject land was zoned "PLR." A PLR zone permits a higher density of use for apartments or condominiums than the previous designated R-20 zone of the subject, which permitted only single family residences.
As noted previously, the site plan to develop 116 residential units on the subject property was approved. The fact that the permit from the inland wetlands watercourses commission had expired because the developer had not shown the completion of substantial work, would not affect the highest and best use of the property. At best, the expiration of the wetlands permit lent an element of uncertainty which would have an impact on the selling price, not the highest and best use. See Gasparri v. Dept.of Transportation, 37 Conn. App. 126, 129, 655 A.2d 268 (1995).
Benedict's opinion that the highest and best use for the subject land was "to do nothing with the appraised land" until some point in the future, was based on a number of incorrect conclusions. Benedict broke down the elements of highest and best use into three categories — legally permissible, physically possible, and financially feasible. Benedict was under the assumption that both the site plan approval by the planning and zoning commission and the wetlands approval had expired before October 1, 1990. As we have noted before, only the wetlands permit had expired by October 1, 1990, not the zoning approval of the site plan. In addition, Benedict concluded that the wetlands and the utility easements on the property severely interfered with the use of the land. Again, this was incorrect. Although Benedict determined that 10% of the land was subject to power line and sanitary sewer line easements and therefore unusable, we find otherwise. Only 2% of the total of 46.79 acres was subject to the utility easements and these easements ran along the south and east corner of the subject. Although Benedict determined that 40% of the subject property consisted of wetlands, we find that only 25% of the land was encumbered by wetlands. Benedict CT Page 5463 testified that wetlands would bar the use of roads and utility easements to the interior development of the land and that sewer and water were not available to the site. Benedict concluded that a total of 60% of the subject land was unusable because of a combination of wetlands, flood lands, and utility easements. This conclusion flies in the face of the approval of the subject land for a change in zone to PLR and approval of the site plan for the construction of 116 units with roadways and utilities crossing wetland areas. In addition, prior to approval of the site plan, the Metropolitan District Commission reviewed the plan and the Department of Environmental Protection reviewed and approved the site plan for the effect of the proposal on the physical environment of the site.
Instead of only 40% of the land available for building residential units as determined by Benedict, we conclude that 70% to 75% of the land was usable, based on our review of the approved site plan. (Defendant's exhibit 2.)
An example of the effect of wetlands on the development of real estate can be shown in the case of South Farms AssociatesLimited Partnership v. Burns, 35 Conn. App. 9, 644 A.2d 940, cert. denied, 231 Conn. 912 (1994). South Farms was a condemnation case which dealt with the issue of the highest and best use of the land. South Farms had purchased land in the town of Newington consisting of 29.9 acres for a proposed development of a hotel and two office buildings for $380,000. The vacant land was an irregularly shaped parcel consisting of open and wooded sections with 20 acres of the total 29.9 acres classified as wetlands. The land was also encumbered by an easement to pass and repass 51 feet wide. The South Farms land was located in a class B business zone. On November 9, 1988, South Farms applied for a change of zone to a CD zone, which would permit the proposed development. South Farms subsequently discovered that the state was going to condemn the whole parcel and therefore ceased all further development activity. One of the state appraisers was of the opinion that the land was non-buildable and that its highest and best use was for open space. The plaintiff's appraisers were of the opinion that the highest and best use of the land was for a hotel and two office buildings. A panel of three trial referees in South Farms determined that the highest and best use of the land was not for open space, but rather for commercial development. Id., 16-17. The trial referees found that it was "`reasonably probable that local, state and federal wetlands permits would issue,'" at least conditionally, "`for a CT Page 5464 portion of the subject site.'" Id., 16. The trial referees also found that the land would have been reclassified from a business zone to a commercial zone. Id.
In the present action the subject property was already zoned for a high density use and the wetlands approval had previously been given and would have continued if work had been started. 70-75% of the present site was useable for development compared to South Farms, where approximately 33% of the site was useable. The determination of Marsele that the subject land's highest and best use was for residential development in conformance with the approved site plan was entirely reasonable and consistent with the comparable finding and conclusions reached by the trial referees in South Farms.
Based on the foregoing, we find unpersuasive Benedict's opinion that the development of the subject was not legally permissible nor physically permissible. Turning to the third category, that the subject development was not financially feasible, we find this position unpersuasive also. Benedict based his opinion of financial considerations on the history of the land.
As we previously found, Dana Eric Friedman, trustee, sold the subject land on April 29, 1988, to Lane Homes for $2,964,000. Lane Homes lost title to the subject through foreclosure proceedings by City Savings Bank FSB in January, 1992. Shortly thereafter City Savings became insolvent and was taken over by the Federal Deposit Insurance Corporation (FDIC). FDIC transferred the subject land to Resolution Trust Corporation in the spring of 1992 because the land was a non-performing asset. (See plaintiff's exhibit B, p. 13.) On December 11, 1995, Resolution Trust sold the subject to the present owner for $73,000. Benedict reported in his appraisal report (plaintiff's exhibit B, p. 29) that Lane Homes failed to develop Glenwood Green and it took Resolution Trust "roughly 3.5 years to market the appraised land." Benedict presented, in his appraisal report, demographics data, housing inventory data, and population to housing ratio to conclude that "[t]he data also demonstrates that there may be no demand for new housing units in the appraised land's Town of Bloomfield." (Plaintiff's exhibit B, p. 20.) Benedict concluded that there was no demand for residential units in Bloomfield and that there was a depressed market for residences in Bloomfield so that a prudent investor would not begin a residential development project in Bloomfield in October, 1990. (Plaintiff's exhibit B, p. 21.) Contrary CT Page 5465 to Benedict's negative conclusion, he testified that Bloomfield had a good residential reputation. Benedict also stated in his appraisal report that "Bloomfield has become one of the fastest growing communities with its farms being converted for residential, industrial and commercial purposes." (Plaintiff's exhibit B, p. 15.) Benedict also made glowing statements about Bloomfield's strong commercial and industrial development and its business friendly atmosphere, as well as stating that:
 Bloomfield has been acknowledge as one of the fastest growing suburbs of Metropolitan Hartford during the past 20 years. Between 1970 and 1980, the town experienced a 21% increase in new housing units. Today's population is close to double that of only a decade ago. In addition, the development of a large mix of retail and service establishments within the town causes the need to travel to other communities to satisfy most purchasing needs to be unnecessary. Today, Bloomfield has grown into a diversified community. One can expect, given the fact that roughly 30% to 50% of the town remains farmland, that this development will continue into the future.
(Plaintiff's exhibit B, p. 15.)
In an overview of the immediate neighborhood to the subject land, Benedict states "[t]he primary form of development which could occur within this neighborhood is of a farming nature by virtue of necessity." (Plaintiff's exhibit B, p. 15.) This statement is hardly consistent with Benedict's conclusion that the highest and best use of the subject property was to hold it for future residential development.
One additional factor impacting our view of Benedict's conclusion that no prudent investor would develop residential units in Bloomfield in October 1990, was the fact that a developer did develop 48 residential units in a PLR zone in Bloomfield not far from the subject site less than one and one-half years after the revaluation date of October 1, 1990. The new development was called Deer Meadow. The Deer Meadow development was a site consisting of 13.53 acres of land off of Blue Hills Avenue. The land in Deer Meadow had been purchased by its developer on April 13, 1989, for $648,000. The 48 units were constructed in December of 1991. The Bloomfield assessor placed a fair market value on the Deer Meadow development on the CT Page 5466 October 1, 1992 list of $2,480,000, with a 70% assessment of $1,736,000. (See plaintiff's exhibit D.) Although Benedict questions the valuation of Deer Meadow because of recorded mortgages totaling over four million dollars, it does not change the fact that the highest and best use of Deer Meadow was for the development of residential units, not for "banking" it for future development. In this case, the fact that the owner of the property as of October 1, 1990 had not yet developed the property in accordance with the approved site plan does not mean that the highest and best use as of that date was not for residential development.
In a de novo real estate tax appeal, it is the taxpayer's burden to establish that his or her property was overvalued.Ireland v. Town of Wethersfield, 242 Conn. 550, 556-58,689 A.2d 888 (1997). "If the trial court finds that the taxpayer has failed to meet his burden because, for example, the court finds unpersuasive the method of valuation espoused by the taxpayer's appraiser, the trial court may render judgment for the town on that basis alone." Id., 557-58.
As the court in Ireland held, there is a two part process in real estate tax appeals: first, the court must make an initial finding that the taxpayer's property was overvalued; and second, if the taxpayer's property was overvalued, the court must determine the amount of the value of the property. Id., 558.
In the present action, we conclude that the plaintiff has not met his initial burden of showing that his property was overvalued. This is so because we do not agree with the plaintiff's appraiser that the highest and best use of the subject property as of October 1, 1990, was to purchase this property and "bank" it for future development.[1] We find that the highest and best use as of October 1, 1990, was for residential development, as evidenced by the approved site plan.
Since we find that the plaintiff has failed to sustain his initial burden that the subject property was overvalued, judgment may enter in favor of the defendant dismissing this appeal without costs to either party.
Arnold W. Aronson Judge Trial Referee