[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Corbin Russwin, Inc., brings this real estate tax appeal CT Page 8045 challenging the assessor's valuation of its real estate located at 225 Episcopal Road in the Town of Berlin on the grand list of October 1, 1996.
The assessor valued the subject property as of October 1, 1996 at $21,588, 300. The plaintiffs appraiser, Patrick A. Lemp, valued the subject premises as of October 1, 1996 at $13,475,000. The town's appraiser, Peter Marsele, valued the subject premises as of October 1, 1996 at $22,000,000.
The subject property consists of 106.02 acres of land improved with a one-story masonry office building with two attached industrial buildings, a one story metal maintenance building and a one story masonry fire pump house, which total 784,000 square feet of building space. The building was originally constructed in 1969 by Emhardt Industries, Inc. for manufacturing use by a single owner. The subject property has 1500 feet of railroad siding and has access from Episcopal Road as well as Deming Road. The premises also contain a bituminous concrete paved driveway and parking area of approximately 645,000 square feet accommodating 1494 parking spaces. The subject is less than one-half mile from the Wilbur Cross Highway, Connecticut Route 15 and Connecticut Route 9, both major four lane highways leading to Interstate I-91 and Interstate I-95. The subject property is located within a general industrial (GI) zone.
Emhardt Industries, Inc. conveyed the subject property to WRC Holdings, Inc. on December 31, 1993 for the reported price of $15,000,000. However, this purchase price was not an arms length transaction since the parties were allowed to arbitrarily allocate the total purchase price of all of the business assets so that the real estate was not independently marketed. WRC Holdings, Inc. subsequently changed its name to Corbin Russwin, Inc., on January 1, 1994.
On the date of the revaluation on October 1, 1996, the plaintiff occupied a portion of the main building, or approximately 35% of the overall gross building area . . . Approximately 13% of the gross building area, or 103,350 square feet of the main building was occupied by a tenant, Sherri Cup, as a warehouse and distribution space. The foundry building, containing 44,200 square feet, was vacant, and had been vacant for approximately fourteen years.
Lemp, the plaintiffs appraiser, determined that the highest and best use of the subject property on October 1, 1996 was for multi-tenancy use. This determination was based on Lemp's conclusion that the remaining vacant space could be leased for warehouse and industrial tenants. Although Lemp concludes that the highest and best use of the property on CT Page 8046 October 1, 1996 was for multi-tenant use, he further points out in his appraisal report that the building was designed as a single tenant manufacturing building and the cost to convert to a multi-tenant use would not be economically feasible. (Plaintiffs Exhibit A, p. 21.)
Marsele, the town's appraiser, was of the opinion that the highest and best use of the subject property was a continuation of the present use of the property as office, industrial and warehouse use. Marsele drew no conclusion on the cost to convert this single tenant use building to a multi-tenant use.
As noted above, on October 1, 1996, the subject property was located within a GI zone, which was formerly a Heavy Industrial (HI) district. The purpose of the GI zone was "[t]o accommodate basic industrial uses and heavy commercial operations incompatible with residential environments and is intended to be less restrictive than the Planned Industrial Zone." (Defendant's Exhibit 8, p. 67.) Permitted uses under the GI zone include multi-tenant uses such as building or construction contractors' yards, landscape contractors, trucking terminal facilities, public warehousing or storage, including self-storage, trucking or courier services, bus terminal/service/storage facilities, including school buses, fuel oil dealers, sanitary services (e.g., trash haulers, septic tank cleaners), building services (e.g., pest control services, building maintenance services), lumber yards or building materials suppliers, equipment cental or leasing services, excluding motor vehicles, electrical repair shops, upholstery or furniture repair shops, manufacturing facilities, wholesaling or distribution facilities, printing, lithography, photocopying or similar graphic arts services, publishing facilities, industrial laundries or dry cleaners, carpet or upholstery cleaning establishments, public utility buildings or facilities, buildings or facilities of local, state or federal government, laboratories devoted to research, design or professional use, offices, excluding medical or dental offices, but including business services such as advertising, computer and data processing, public relations, management or personnel supply.
The highest and best use of real estate is that use which produces the highest market value which translates into the greatest financial gain or the most profit. Metropolitan District v. Burlington, 241 Conn. 382,390, 692 A.2d 969 (1997). In this context, both Lemp and Marsele concluded that the use that would produce the greatest financial gain as of October 1, 1996 would be to break up the subject property into segments and market those segments for uses consistent with the GI zone. We assume that both Lemp and Marsele had in mind the leasing of the segments rather than the sale of these segments. The reason that we make this assumption is that sales of the segments would implicate subdivision CT Page 8047 approval, and there is no evidence that subdivision of the subject was ever a consideration of the owner of the property. Only Marsele was of the opinion that a portion of the 106.02 acres of the subject land could be subdivided into saleable lots to produce additional gain to the owner as of October 1, 1996. of course, this is pure speculation since, as we have concluded, no evidence was presented that any subdivision application was in progress or that there was such a proceeding on the horizon. See Budney v. Ives, 156 Conn. 83, 89, 239 A.2d 482 (1968). We conclude that the highest and best use of the subject property as of October 1, 1996, would be to lease various segments of the subject property consistent with the uses permitted by zoning.
Lemp and Marsele considered the three commonly accepted methods of determining fair market value of real estate: cost, income capitalization and market sales. Marsele arrived at a fair market value of $22,273,000 as of October 1, 1996, using the cost approach. He arrived at this valuation after taking a 70% depreciation factor of the buildings. We disagree with Marsele's opinion that the cost approach is a viable approach to use to determine the value of the subject property. "The cost approach is generally most applicable in valuing new or relatively new construction when improvements represent the highest and best use of the site . . . and no functional or external obsolescence is evident." The Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 321. We agree with Lemp that the use of the cost approach is not a valid approach in this case when such a high depreciation of the buildings must be used to determine value.
Using the income approach, Marsele considered four leases of land and buildings ranging between $3.98 triple net and $10.18 triple net in gross rent per square foot. Lemp, on the other hand, considered six leases of land and buildings ranging between $1.70 triple net and $3.50 triple net in gross rent per square foot. Three of Marsele's four leases were relatively small in gross building area and were leased to a single tenant. Lemp's leases were larger properties that were formerly single owner manufacturing facilities turned into warehouse distribution use consistent with our finding of highest and best use. The most credible of the comparable leases selected by either appraiser was the Advo Systems lease used by Lemp. This lease was executed on September 1, 1995 for property located at 289 Weston Street, Hartford. The lease was originally structured at $4.50 per square foot of gross building area, triple net. However, the renewal lease in 1995 was set at $3.50 triple net. This building, similar to the subject, was constructed in 1967 and contains 276,748 square feet of gross building area.
The reason for the wide discrepancy in valuation between Lemp and Marsele (approximately $8,500,000) arises from their selections of CT Page 8048 comparable leases. As an example, Marsele selected as a comparable 97 Newberry Road, East Windsor, which was a 39.41 acre parcel of land with a one story industrial building built in 1988 containing 275,147 square feet of gross building area. This comparable was leased from Beckenstein Enterprises to Hamilton Standard for 15 years from October 1, 1988 for $10.18 per square foot for the first 5 years and $15.44 per square foot for the next 10 years, triple net. On the other hand, Lemp selected a comparable at 96 Newberry Road, East Windsor, next door to the comparable selected by Marsele. Lemp's comparable was a lease to Ingram Industries, Inc. on August 1, 1995 with a base rental structure of $1.50 per square foot but with the tenant paying for improvements which effectively raised the rent to $3.29 per square foot. The comparable used by Lemp contained 275,000 square feet of gross building area.
Considering the comparables used by both appraisers, we find the Advo Systems lease to be the most representative of the market for the subject property on October 1, 1996. We therefore determine that the market rent for the subject property as of October 1, 1996 was $3.50 per square feet of gross building area. This is consistent with the subject property's use by the plaintiff on October 1, 1996 and its lease of 103,350 square feet of building space to Sherri Cup for $3.29 per square foot.
We arrive at a gross income of $2,744,000 by multiplying the 784,000 square feet of gross building area of the subject by $3.50 per square foot. From the evidence presented, we deduct a vacancy and collection factor of 5%, or $137,200, and we also deduct an expense factor of 3%, or $82,320, to arrive at a net operating income of $2,524,480. Both appraisers used the direct capitalization approach by determining the capitalization rate using the band of investment technique. The band of investment technique has two components, a mortgage component and an equity component. See The Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 470. After reviewing the process through which Marsele and Lemp derived their capitalization rate, we consider a capitalization rate of 14% to be the most credible. We agree with Lemp that a tax component should not be added to the capitalization rate since the data upon which the appraisers based the capitalization rate was triple net comparables where the tenant, not the owner, paid the taxes on the property. Using the net operating income of $2,524,480 divided by a capitalization rate of 14%, we arrive at a fair market value of $18,032,000.
We now turn to the market sales approach used by both Marsele and Lemp to arrive at fair market value. Lemp arrived at a sale price per square foot of $17.46 based upon his analysis of three comparable sales. Sale one, in Westfield, Massachusetts, was purchased on April 2, 1996 by an investor for $13.65 per square foot of gross building area. Sale one had CT Page 8049 a gross building area of 527,521 square feet and was leased to Caldor Corporation for warehouse purposes. A substantial addition of 121,705 square feet was added to the building in 1996. Sale two was a warehouse distribution facility consisting of 298,555 square feet of gross building area in Manchester, Connecticut, sold by Grossman's Inc. to Manchester Acquisitions Corp. This sale occurredon March 27, 1995, for $30.15 per square foot of gross building area. Lemp's third comparable was a sale in Windsor, Connecticut from Allied Grocers Cooperative, inc. to Windsor Circle, LLC on November 8, 1994, for $14.96 per square feet of gross building area. This property contained 52.53 acres and had a gross building area of 367,675 square feet.
Marsele arrived at a sale price per square foot of $29.00 based upon his analysis of five comparable sales. of the five comparables used by Marsele, four had an adjusted value per square foot of gross building area of $30.17, $30.93, $33.01, and $31.23. The remaining comparable had a adjusted value of $17.26 per square foot of gross building area. Three of Marsele's comparables were sales occurring in 1998, whereas the remaining two took place in 1997. The largest of Marsele's comparables was 74 Griffin Road in South Windsor. This property was constructed in 1986 and contained 332,470 square feet of building area. It sold on June 16, 1998 for $25.57 per square feet of gross building area.
We view Lemp's comparables to be too low and Marsele's comparables to be too high to be credible comparable sales. Given the disparity between the two appraisers, we give no weight to the use of the sales approach. We find that the income approach is more credible to use than the market approach to determine the subject's fair market value as of October 1, 1996. Accordingly, we find that the fair market value of the subject property as of October 1, 1996 was $18,032,00.
Judgment may enter in favor of the plaintiff without costs to either party. The assessor shall reduce the value of the property in accordance with this opinion beginning on the October 1, 1996 grand list until the next revaluation of the town.
 Arnold W. Aronson Judge Trial Referee